IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| JAMES ARMSTRONG, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 20-03222-CV-S-WBG |
| | ) | |
| KILOLO KIJAKAZI,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER AND OPINION AFFIRMING ACTING COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff James Armstrong, Jr.'s appeal of Defendant Acting Commissioner of Social Security's final decision denying his application for supplemental security income. After carefully reviewing the record and the parties' arguments, the Acting Commissioner's decision is **AFFIRMED**.

### I.  BACKGROUND

Plaintiff, who was born in 1971, has a high school diploma and no past relevant work. R. 34, 130, 243. In January 2017, he applied for supplemental security income, alleging a disability onset date of December 11, 2015. R. at 26, 243-49. Plaintiff's application was denied, and he requested a hearing before an administrative law judge ("ALJ"). R. at 26, 161-65, 169-81.

In June 2018, the Social Security Administration ("SSA") acknowledged receipt of Plaintiff's request for a hearing. R. at 169-71. The SSA's communication directed Plaintiff to provide evidence "no later than five business days before the date of your hearing" and stated "[t]he ALJ may choose to not consider the evidence if you fail to provide it timely." R. at 170. In

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi, who was appointed as the Acting Commissioner of the Social Security Administration, is automatically substituted as Defendant in this suit.

October 2018, the SSA notified Plaintiff that his hearing was set for January 3, 2019. R. at 184-89. Similar to the SSA's prior communication, the notice stated the following:

> **If you are aware of or have more evidence, such as recent records, reports, or evaluations, you must inform me about it or give it to me no later than 5 business days before the date of your hearing. If you do not comply with this requirement, I may decline to consider the evidence unless the late submission falls within a limited exception.**

R. at 186 (emphasis in original). The limited exceptions were also outlined in the letter. *Id*.

On January 2, 2019, Plaintiff's counsel asked to continue the hearing. R. at 202. In March 2019, the SSA notified Plaintiff and counsel of the new hearing date: June 12, 2019. R. at 203-08. Identical to the October 2018 letter, the SSA's notification reiterated that evidence must be submitted no later than five days before the hearing. R. at 205. On May 17, 2019, Plaintiff's counsel submitted more than 200 pages of medical records to the SSA. R. at 399-622. On May 29, 2019, the SSA sent a letter to Plaintiff and his counsel reminding them of the hearing. R. at 233-34.

On June 12, 2019, ALJ Michael Comisky conducted the hearing. R. at 120-47. During her opening statement, Plaintiff's counsel informed the ALJ that she intended to obtain a prior evaluation that may include an IQ test. R. at 124. Counsel explained she became aware of the evaluation while meeting with Plaintiff during the day before and the morning of the hearing. *Id*. If the evaluation she sought to obtain did not include an IQ test, Plaintiff's counsel also asked the ALJ to order an IQ test. *Id*.

The ALJ noted counsel had "been on this case since February of 2018" but made the request at the hearing. R. at 125. He stated he could not timely obtain an IQ test. *Id*. He also observed there may be "a duration issue also." *Id*. The ALJ indicated a "remedy might be to withdraw the claim and refile and I'll do all the testing then, if you haven't go[t] testing." *Id*. After an off-the-

record discussion with counsel, Plaintiff chose to move forward with his claim and the scheduled hearing. *Id*.

During the hearing, Plaintiff testified he graduated from a parochial high school but was told he was at a fifth-grade level when he graduated. R. at 126-27, 130-31.[2] He did not recall taking an IQ test while in school. R. at 141. Plaintiff remembered undergoing testing related to his Medicaid application, but he was not sure if he took an IQ test. R. at 141-42. A vocational expert also testified during the hearing. R. at 143-45.

At the close of the hearing, Plaintiff's counsel informed the ALJ that she would request the evaluation referenced during Plaintiff's testimony. R. at 146. She asked that she be allowed to submit the evaluation. *Id.* She also renewed her request that the ALJ send Plaintiff for an IQ test. *Id.* The ALJ told counsel she was "way past" the "five-day rule," which requires information and evidence be submitted to the ALJ no later than five business days before the hearing date unless the claimant satisfies a limited exception to the rule. *Id.*; 20 C.F.R. § 416.1435(a)-(b). Plaintiff's counsel indicated she understood the five-day rule but explained she did not find out about the evaluation until the day before the hearing. *Id*.

Eight days after the hearing, Plaintiff's counsel submitted a psychological evaluation conducted on August 1, 2017, at WeCare Counseling. R. at 40-43. The evaluation was "requested to determine [Plaintiff's] current level of psychological functioning to aid with the determination of his eligibility for medical assistance." R. at 41. According to the examiner, Plaintiff's "thought processes were unremarkable," "he completed all test tasks requested of him," "[h]is memory

---

[2] Plaintiff's June 2019 testimony is not entirely consistent with the record. In his February 2017 Adult Disability Report submitted to the SSA, Plaintiff stated he "was at the 10th grade level" when he graduated from high school. R. at 275. Two months later, he told a consultative examiner he "was at a 9th grade level" when he graduated. R. at 389. In March 2018, he again reported he was at a ninth-grade level when he graduated. R. at 408. But, in August 2018, Plaintiff said he was at an eighth-grade level when he graduated. R. at 610. About six months later, his intellectual functioning/level of comprehension was listed as "[m]iddle school." R. at 621.

3

functioning appeared intact," and "[h]e appeared to comprehend what was said to him and spoke openly during the clinical interview." R. at 42.

The Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV) was also administered at that time to assess and evaluate Plaintiff. *Id.*[3] His WAIS-IV scores were Verbal Comprehension Index: 78, Perceptual Reasoning Index: 77, Working Memory Index: 80, Processing Speed Index: 84, and Full Scale IQ: 75. R. at 42. The examiner noted Plaintiff's "Full Scale IQ corresponds to the 5th percentile and falls within the Borderline range of intellectual functioning. There is a 95% chance that his true Full Scale IQ lies within the range of scores from 71 to 80." *Id*. He did not exhibit "significant strengths or weaknesses" related to verbal comprehension or perceptual reasoning. *Id*. at 42-43. But Plaintiff's "Working Memory Index, which measures simultaneous and sequential processing, attention, and concentration, and Processing Speed Index, which measures the speed of mental and graphomotor processing, fall within the Low Average range of functioning." *Id*. at 43.

On July 3, 2019, the ALJ issued his decision. R. at 26-36. Therein, he denied the request made by Plaintiff's counsel during the hearing to belatedly submit additional medical records including the IQ test. R. at 26-27. The ALJ noted a claimant seeking to have written evidence considered at a hearing must submit or inform the ALJ "about the evidence no later than five business days before the date of the scheduled hearing," and late submitted evidence could only be considered in certain instances. R. at 26 (citing 20 C.F.R § 416.1435). He found Plaintiff's counsel's reason for belatedly submitting the IQ test did not fall within "an exception to the 5 Day Letter rule." R. at 27. Thus, he excluded the IQ test "because the requirements of 20 CFR 416.1435(b) [we]re not met." R. at 26.

---

[3] According to the report, WAIS-IV is "a comprehensive, individually administered clinical instrument designed to assess the cognitive ability of adolescent and adults…." R. at 42.

4

The ALJ also denied counsel's request to order an IQ test. R. at 27. He found counsel did not satisfy the regulatory requirements for such a request, which must be made "well in advance of a scheduled hearing." *Id*. The ALJ noted counsel had represented Plaintiff since February 2018 and knew "consultative examinations take months to schedule and for those results to be obtained." *Id*. He also acknowledged if he ordered an IQ test, an additional issue would arise. *Id*. That is, Plaintiff did not have an IQ test in school, which is required "to meet a medical listing concerning IQ issues," "so there is a lack of foundation provided by the representative for the need for IQ testing as it would only establish a new issue with a lack of duration for the current claim." *Id*.

The ALJ found Plaintiff's severe impairments are affective disorder, anxiety disorder, and neurodevelopmental disorders. R. at 30. He determined Plaintiff has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with certain nonexertional limitations: "He can understand, remember, and carry out simple work instructions and tasks at an SVP 2 level. He can have occasional contact with co-workers, supervisors, and the general-public. He should not do teamwork types of job duties. He should not work with the general-public as a primary job duty." R. at 32.

Based upon his review of the record, his RFC determination, and the hearing testimony, the ALJ determined Plaintiff can work as an industrial cleaner, order filler, or laundry worker, and therefore, he is not disabled. R. at 34-35. Plaintiff unsuccessfully appealed the ALJ's decision to the SSA's Appeals Council. R. at 1-4, 239-42. Plaintiff now appeals to this Court, arguing this matter must be reversed and remanded because the ALJ's RFC is not supported by substantial evidence, and the ALJ improperly discredited Plaintiff's subjective complaints. Doc. 3; Doc. 17 at 1, 9-20; Doc. 23 at 1-5.

5

## II. STANDARD OF REVIEW

Judicial review of the Commissioner's decision is a limited inquiry into whether substantial evidence supports the Commissioner's findings and the correct legal standards were applied. 42 U.S.C. § 405(g); *Turpin v. Colvin,* 750 F.3d 989, 992-93 (8th Cir. 2014). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support a conclusion." *Noerper v. Saul*, 964 F.3d 738, 744 (8th Cir. 2020) (citation omitted); *see also Biestek v. Berryhill,* 139 S. Ct. 1148, 1154 (2019) (observing the threshold for substantial evidence is not high). In evaluating for substantial evidence, a court must consider evidence supporting as well as evidence detracting from the Commissioner's decision. *Anderson v. Astrue,* 696 F.3d 790, 793 (8th Cir. 2015). "As long as substantial evidence in the record supports the Commissioner's decision, [a court] may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently." *Cline v. Colvin*, 771 F.3d 1098, 1102 (8th Cir. 2014) (citation omitted). If after reviewing the entire record it is possible to draw two inconsistent positions and the Commissioner adopted one of those positions, a court must affirm. *See Anderson*, 696 F.3d at 793.

The Court must also determine whether the Commissioner's decision is based on legal error, such as a procedural error, application of an erroneous standard, or incorrect application of the law. *See Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted). Relevant to this appeal, if the Commissioner issues a decision adverse to a claimant because the claimant failed to "submit proof in conformity with any regulation prescribed under" 42 U.S.C. § 405(a),[4] "the court shall review only the question of conformity with such regulations and the validity of such

---

[4] Pursuant to section 405(a), the Commissioner "shall adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder." 42 U.S.C. § 405(a). The SSA's regulation containing the "five-day rule" sets forth when evidence is submitted to the ALJ prior to the hearing, when an ALJ may decline to consider or obtain evidence, and limited exceptions to the rule. *See* 20 C.F.R. § 416.1435.

regulations." 42 U.S.C. § 405(g). When a regulation allows an ALJ to exercise discretion, the Court must decide whether the ALJ abused his or her discretion. *See Passmore v. Astrue*, 533 F.3d 658, 665-66 (8th Cir. 2008); *Carter v. Sullivan*, 909 F.2d 1201, 1202 (8th Cir. 1990) (citations omitted); *Owsley v. Saul*, No. 4:18-CV-01328-SRC, 2020 WL 999203, at *7 (E.D. Mo. Mar. 2, 2020) (noting "the 5-day rule gives the ALJ discretion to admit or exclude the late-submitted evidence.") (citations omitted).

### III. DISCUSSION

#### A. The ALJ's RFC

Plaintiff's first argument focuses on the ALJ's RFC. One's RFC is the "most you can still do despite your limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ must base the RFC on "all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000). Because the RFC is a medical question, "an ALJ's assessment of it must be supported by some medical evidence of [Plaintiff's] ability to function in the workplace." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Plaintiff contends the record did "not provide clear evidence indicating how [his] functioning was affected by his intellectual limitations," and therefore, the ALJ erred by (1) excluding the belatedly submitted IQ test, and (2) declining the request for an IQ test. Doc. 17 at 9-16.

#### (1) The ALJ's Decision to Exclude the Belatedly Submitted IQ Test

The parties agree a claimant must submit evidence or inform the ALJ of evidence no later than five business days before the hearing unless the claimant satisfies a limited exception to the five-day rule. Doc. 17 at 13-15; Doc. 22 at 9-12. Neither party disputes Plaintiff failed to timely submit (or otherwise inform the ALJ of) the August 1, 2017 IQ test. But the parties disagree as to whether the ALJ erred by finding Plaintiff did not satisfy an exception to the five-day rule, and

7

consequently, whether the ALJ erred in excluding the belatedly submitted IQ test. *See* Doc. 17 at 13-15; Doc. 22 at 9-12. Plaintiff argues his "reduced ability in intellectual functioning was the likely cause of him not informing his counsel about this evaluation and IQ testing." Doc. 17 at 14.[5] He avers his "mental impairment" was established by his hearing testimony, "noted lack of knowledge exhibited in the medical records, and reported difficulties in school." *Id*.

Before delving into Plaintiff's alleged exception to the five-day rule, the Court must first address the rule's initial requirements. The five-day rule requires claimants to "**make every effort** to ensure" the ALJ received or was informed of all evidence no later than five business days before the hearing. 20 C.F.R. § 416.1435(a) (emphasis added). Before the ALJ, Plaintiff failed to establish he made every effort to ensure the ALJ received or was informed of all evidence. And now, before this Court, Plaintiff has not demonstrated he made every effort to provide evidence to the ALJ, or inform him of evidence, no later than five business days before the hearing.

Instead, the record reflects Plaintiff's counsel should have known about the WeCare Counseling evaluation as of May 17, 2019 when she submitted other medical records to the SSA. R. at 399-622. Among the records submitted by counsel was an August 1, 2017 progress note from a community support specialist about a "WeCare" appointment. R. at 447. Therein, the specialist noted she "assisted client with appointment with WeCare to get an assessment" and "asked how [the] assessment went." *Id*. Plaintiff told the specialist he believed "the session went well and described some of the things they asked." *Id*. The records submitted by Plaintiff's counsel also contained a progress note dated December 19, 2017, which indicates a community support specialist made a copy of Plaintiff's "IQ results," and they would discuss the results at

---

[5] Plaintiff does not argue any other exception to the five-day rule – i.e., the SSA's actions misled him, or an unusual, unexcepted, or unavoidable circumstance beyond his control prevented him from submitting the evidence – applies. 20 C.F.R. § 416.1435(b)(1), (3).

8

Case 4:20-cv-03222-WBG   Document 30   Filed 03/28/22   Page 8 of 17

their next visit. R. at 472. Although the medical records submitted to the SSA by counsel indicated Plaintiff had an "appointment" and "assessment" at WeCare, and that there were follow-up discussions regarding his IQ test results, the record does not reflect that Plaintiff's counsel attempted to obtain the WeCare records before the hearing.[6]

Assuming, without deciding, Plaintiff made every effort to ensure the ALJ received or was informed of the evidence pursuant to the five-day rule, the record does not establish an exception to the five-day rule was satisfied. During the hearing and in the letter to the ALJ accompanying the belatedly submitted IQ test, Plaintiff's counsel represented the IQ test was not provided before the hearing because she was not aware of its existence until she met with Plaintiff on the day before the hearing. R. at 40, 124, 146.[7] At no point was Plaintiff's "reduced ability in intellectual functioning" asserted as the reason for the belatedly submitted IQ test. Accordingly, the Court finds the ALJ did not err in finding Plaintiff failed to satisfy an exception to the five-day rule, and thus, the ALJ did not err in excluding the belatedly submitted IQ test.

Even if the ALJ erred in excluding the belatedly submitted IQ test, Plaintiff has not demonstrated the ALJ's error, assuming there was an error, was not harmless. "To show an error was not harmless, [the plaintiff] must provide some indication that the ALJ would have decided differently if the error had not occurred." *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012)

---

[6] Because the record does not establish Plaintiff made every effort to ensure the ALJ timely received or was informed of evidence, the Court's analysis could stop here. *See*, *e.g.*, *Odis W. M. v. Saul*, No. CV 20-311 (DSD/BRT), 2020 WL 8713688, at *4 (D. Minn. Nov. 30, 2020) (observing the plaintiff's attorney "had the opportunity to sort through the records received…to confirm all relevant records" were included, finding counsel was not diligent in reviewing the records, and holding the ALJ did not err in excluding late submitted evidence), *report and recommendation adopted*, No. CV 20-311 (DSD/BRT), 2021 WL 568456 (D. Minn. Feb. 16, 2021).

[7] Although he argues in this appeal that his "reduced ability in intellectual functioning" satisfied an exception to the five-day rule, Plaintiff does not cite legal authority indicating this Court is permitted to consider a basis for an exception to the five-day rule that was not presented to the ALJ. This Court's decision is limited to "the pleadings and transcript on the record." 42 U.S.C. § 405(g). Thus, this Court cannot consider Plaintiff's argument that a particular exception to the five-day rule applies when that argument was not raised before the ALJ. Even if the argument was presented to the ALJ and he erred in excluding the belatedly submitted evidence, any error was harmless for the same reasons described herein.

(citation omitted).  Plaintiff argues his WAIS-IV test scores "suggest greater limitations in [his] ability to process information, attend [sic], and concentrate."  Doc. 17 at 14-15.  He, however, does not explain what further limitations are indicated.  *See id*.

Regardless, even without considering the IQ test, the ALJ found Plaintiff was moderately limited in his abilities to understand, remember, or apply information; concentrate, persist, or maintain pace; and interact with others.  R. at 30.  Based on these moderate limitations, the ALJ's RFC included the following restrictions: "He can understand, remember, and carry out simple work instructions and tasks at an SVP Level 2.  He can have occasional contact with co-workers, supervisors, and the general-public.  He should not do teamwork types of job duties.  He should not work with the general-public as a primary job duty."  R. at 32.

Plaintiff does not provide any indication that had the ALJ considered the belatedly submitted IQ test, his decision would have been different.  *See Dotson v. Saul*, No. 4:20 CV 310 RWS, 2021 WL 2529786, at *6 (E.D. Mo. June 21, 2021) (finding remand was "not required because the ALJ's decision to apply the 5-day requirement and exclude [a] supplemental opinion would amount to, at most, harmless error").  Further, the IQ test does not implicate more restrictive limitations than those included in the ALJ's RFC.  If anything, the IQ test further supports the limitations in the ALJ's RFC.  For the foregoing reasons, the Court finds that if the ALJ erred in excluded the IQ test, the error was harmless.

### (2)  The ALJ's Decision Not to Order an IQ Test

Plaintiff asserts the record did not provide "clear" or "direct" evidence of how his intellectual limitations affected his functioning, and therefore, the ALJ erred by denying Plaintiff's request for an IQ test.  Doc. 17 at 10-11, 15-16.  An ALJ "bears a responsibility to develop the record fairly and fully."  *Combs v. Berryhill*, 878 F.3d 642, 646-47 (8th Cir. 2017) (citation omitted).  However, an ALJ is not required to order a medical examination or test unless "the

10

medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (citations omitted).

Here, the record was sufficiently developed. In addition to years of treatment records and progress notes (*see* R. at 344-622)[8] and function reports (*see* R. at 276-89, 306-24), state agency psychological consultant Darline Thorson, Ph.D., provided an opinion on Plaintiff's functional limitations. R. at 148-59. She opined Plaintiff is limited to unskilled work but retains the abilities to understand, remember, and carry out very short and simple instructions; make simply work-related decisions; complete normal workday; perform activities within a schedule; sustain an ordinary routine without special supervision; accept instructions and respond appropriately to supervisors' criticism; and adapt. R. at 155-57. Dr. Thorson also found Plaintiff was moderately limited in his ability to interact appropriately with the general public, get along with coworkers without distracting them or exhibiting behavioral extremes, and work in coordination with or in proximity to others without being distracted by them. R. at 155-56. The ALJ gave significant weight to Dr. Thorson's opinion and incorporated her findings in the RFC. R. at 32-33.[9]

Based on the foregoing, the record was sufficiently developed for the ALJ to determine whether Plaintiff is disabled. Therefore, the Court finds the ALJ did not err in denying Plaintiff's request for an IQ test. *See Johnson*, 627 F.3d at 320 (finding the ALJ did not err in failing to request an IQ test because the record was sufficiently developed); *Holtel v. Colvin*, No. 2:13-CV-112 CEJ, 2015 WL 417534, at *13 (E.D. Mo. Feb. 2, 2015) (holding the ALJ was not required to further develop the record because a reference to "rule out" diagnosis did not reflect a request to

---

[8] These records provide information about Plaintiff's cognitive abilities and functional limitations. By way of example, an annual assessment from March 2019 indicates Plaintiff can reason, plan, think, learn, problem solve, and communicate at a middle school level. R. at 621

[9] In addition, Plaintiff underwent a consultative examination with Tosha Larson, Ph.D., in April 2017. R. at 389-94. The ALJ gave little weight to Dr. Larson's opinion (*see* R. at 33), and Plaintiff does not argue the ALJ improperly discounted Dr. Larson's opinion.

complete additional testing, the plaintiff's "less than average learning ability" was considered when determining whether she was able to work, and there was no evidence that the plaintiff functioning "in the low average range of cognitive ability" precluded her from working).[10]

Further, even if the ALJ's failure to order an IQ test could be considered error, reversal is not warranted because Plaintiff has not argued – much less, shown – the ALJ's failure was unfair or prejudicial. *See Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995) (citation omitted). The ALJ still considered Plaintiff's cognitive abilities and accounted for his limited intellectual functioning when formulating the RFC. *See Johnson*, 627 F.3d at 320 (holding the ALJ accounted for the plaintiff's limited intellectual functioning by requiring "concrete instructions and limiting the jobs to unskilled or low semi-skilled work.").

**B.     Subjective Complaints**

Plaintiff also argues the ALJ improperly evaluated Plaintiff's subjective complaints because the ALJ "relied on a mistaken classification of the record, overlooked relevant evidence, and did not address factors that bolstered [his] credibility." Doc. 17 at 16-17. When evaluating a claimant's subjective complaints, the ALJ "must consider objective medical evidence, the claimant's work history, and other evidence relating to (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) the claimant's functional restrictions." *Schwandt v. Berryhill*, 926 F.3d 1004, 1012 (8th Cir. 2019) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984), and 20 C.F.R. § 404.1529(c)). The ALJ is not required to discuss each of these factors. *Id*. (citation omitted). Further, the "ALJ may decline to

---

[10] Also, "[w]hile an IQ test is helpful in determining whether an applicant has a mental impairment, it is not the only evidence that may be examined." *Johnson v. Barnhart*, 390 F.3d 1067, 1071 (8th Cir. 2004) (citation omitted).

credit a claimant's subjective complaints 'if the evidence as a whole is inconsistent with the claimant's testimony.'" *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016) (citation omitted).

On appeal, this Court does not reweigh the evidence before the ALJ. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citation omitted). Additionally, the Court must "defer to the ALJ's determinations regarding" a claimant's subjective complaints, "so long as they are supported by good reasons and substantial evidence." *Id*. (citation omitted). This is because determinations about a claimant's subjective complaints "are in the province of the ALJ," and this Court "will not substitute its opinion for the ALJ's, who is in a better position to gauge [subjective complaints] and resolve conflicts in evidence." *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1090 (8th Cir. 2018) (citations omitted).

The ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent with the medical evidence and other evidence in the record." R. at 32. He noted Plaintiff generally presented at examinations and appointments with mostly normal findings, he received conservative treatment, he admitted that medications helped his symptoms, and he engaged in activities not indicative of disabling limitations. R. at 33 (citations omitted). Plaintiff argues the ALJ (1) overlooked seven records containing "abnormal findings," (2) failed to consider mental impairments are unstable and may wax and wane, (3) did not identify what evidence supported his conclusion that Plaintiff's treatment was conservative, (4) overstated Plaintiff's role as his girlfriend's "caretaker," and (5) failed to consider consistencies between Plaintiff's initial reports and statements to medical providers. Doc. 17 at 17-20. As explained below, these arguments fail.

### (1) Allegedly Overlooked Records

Plaintiff argues the ALJ overlooked seven records containing abnormal findings. Doc. 17 at 18. However, when discussing Plaintiff's subjective complaints, the ALJ cited all but two of these records. *See* R. at 33 (citing, among other things, B2F/17 (R. at 369), B2F/30 (R. at 382), B3F/4 (R. at 392), B4F/41 (R. at 439), and B5F/4 (R. at 461)). The two records identified by Plaintiff that were not cited in the ALJ's decision include a July 2018 progress note (R. at 517) and a March 2019 assessment (R. at 617). The July 2018 progress note contained the following observations: "[s]peech is coherent with normal fluency and pace"; good eye contact; "linear and well organized" thoughts; affect was "[c]ongruent – full range"; "[o]riented as to person, place, & time"; judgment and insight were fair; grooming and hygiene were "[v]ery good"; and "below average" level of knowledge. R. at 517. The March 2019 assessment indicated Plaintiff's appearance was "disheveled/unkempt," his speech rate and tone were normal, he had no memory or orientation impairments, his insight was good, his judgment was fair, his mood was "slightly anxious," "normal" affect, and his eye contact was "avoidant." R. at 617-18.

The supposedly overlooked records do not encompass abnormal findings – at least not to the degree Plaintiff suggests. Even if they did, the ALJ properly found the objective evidence **as a whole** was inconsistent with Plaintiff's subjective complaints. R. at 33. The Court finds the ALJ's finding is supported by good reasons and substantial evidence. Therefore, this Court will not reweigh the objective evidence that was before the ALJ or substitute its opinion for the ALJ's.

### (2) Waxing and Waning

Plaintiff argues the ALJ did not account for his mental impairments waxing and waning. Doc. 17 at 18. In support, Plaintiff points to two instances – one in 2016 and one in 2018 – where his symptoms improved but later worsened. *Id*. In the first, Plaintiff reported "his mood was back and forth and he became angry easily." R. at 373. However, the therapist noted Plaintiff's hygiene

and grooming were "good," he was "friendly," and he agreed to "practice anger management skills." R. at 373. After participating in breathing exercises with the therapist, Plaintiff reported feeling "a lot better." *Id*. The second record cited by Plaintiff is the March 2019 assessment discussed above. R. at 617-18; *see supra*, section III(B)(1).

"[I]ndividuals with a mental illness may experience periods during which they are relatively symptom-free," but their "level of functioning can vary significantly over time." *Mabry v. Colvin*, 815 F.3d 386, 392 (8th Cir. 2016) (citation omitted). There may be times when a person with mental illness is symptom-free, but given the unpredictable nature of mental illness, relapse is possible. *See Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001) (citation omitted). To the extent Plaintiff's symptoms waxed and waned, the two records discussed above do not reflect Plaintiff's level of functioning varied significantly over time. In addition, the ALJ considered the longitudinal record of Plaintiff's mental health and properly evaluated his symptoms over time.

### (3) Conservative Treatment

Plaintiff argues the ALJ failed to identify what evidence supported his conclusion that Plaintiff's treatment was conservative, and his "treatment of medication management, counseling, and community support does not constitute conservative treatment." Doc. 17 at 18. In finding Plaintiff's impairments were less limiting than his subjective complaints suggested, the ALJ noted Plaintiff received "mostly conservative treatment" in the forms of counseling and medication management. R. 32 (citations omitted). The ALJ observed Plaintiff admitted medication helped him with his panic attacks, and he never received inpatient treatment for his mental impairments. R. at 33. With medication and counseling, Plaintiff often reported feeling "good," "pretty good," "great," or "doing better." *Id*.; *see also* R. at 374-75, 453, 455, 457, 461, 466, 468, 472, 479, 481, 483, 485, 488, 490, 492, 501, 509, 513, 527, 529, 531, 537, 539-40, 542, 549, 565, 585, 587, 589,

15
Case 4:20-cv-03222-WBG    Document 30    Filed 03/28/22    Page 15 of 17

594, 596, 600, 605. Additionally, mental status examinations and clinical observations revealed mostly normal findings. R. at 33; *see also* R. at 375, 382, 392, 439, 496, 591, 596, 600, 605.

Although Plaintiff fails to cite authority for his position, this Court and other district courts have found medication management and counseling constitute conservative treatment for mental impairments. *See Pierce v. Kijakazi*, No. 20-5073-CV-SW-MDH, 2022 WL 551135, at *5 (W.D. Mo. Feb. 23, 2022) (observing the plaintiff underwent conservative treatment in the forms of medication management and counseling for her mental health impairments); *Jennifer G. v. Kijakazi*, No. 20-cv-1197 (LIB), 2021 WL 6231437, at *8 (D. Minn. Sept. 29, 2021) (noting medication management without psychiatrist hospitalizations is conservative treatment for mental impairments); *Alie v. Berryhill*, No. 4:16 CV 1353 JMB, 2017 WL 2572287, at *10 (E.D. Mo. June 14, 2017) (stating conservative treatment for mental impairments included outpatient medication management and counseling). In addition, the Court is mindful of the Eighth Circuit's holding that "[i]f an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Hensley*, 829 F.3d at 933–34. Here, Plaintiff was conservatively treated, and as noted by the ALJ, he responded well to the treatment. R. at 33.

### (4) Role as Caretaker

Plaintiff maintains the ALJ overstated his role as his girlfriend's caretaker and failed to consider his ability to sustain his caretaking activities over a period of time. Doc. 17 at 19. Plaintiff avers his caretaking responsibilities consist of getting his girlfriend water, cooking, and cleaning sometimes. *Id.* When considering Plaintiff's subjective complaints, the ALJ noted Plaintiff described himself as his girlfriend's caretaker. R. at 33 (citing B7F/21 (R. at 592)). In this regard, the ALJ did not discuss what that role entailed for Plaintiff, and thus, did not discount Plaintiff's subjective complaints based on what he does as his girlfriend's caretaker. *Id.*

### (5) Initial Reports to Medical Providers

Finally, Plaintiff argues the ALJ failed to consider the consistency between Plaintiff's "initial reports with his statements to his medical providers." Doc. 17 at 19-20. He contends he reported he was sad, worthless, hopeless, depressed, anxious, had difficulty concentrating, and had short-term memory issues to mental health care providers, and examinations revealed abnormalities consistent with his reports. *Id*. In support, he cites the same seven records identified and discussed *supra*, section III(B)(1). For the same reasons set forth therein, the Court rejects Plaintiff's argument about the consistency between his reports and examinations.

Based on the foregoing, the Court finds the ALJ's determinations as to Plaintiff's subjective complaints are supported by good reasons and substantial evidence.

## IV. CONCLUSION

For all the foregoing reasons, the Court finds the Acting Commissioner's decision is supported by substantial evidence on the record as a whole, and the correct legal standards were applied. Accordingly, the Acting Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

DATE: March 28, 2022  /s/ W. Brian Gaddy
W. BRIAN GADDY
UNITED STATES MAGISTRATE JUDGE